**Carole JANOPOULOS, Plaintiff,**

v.

**HARVEY L. WALNER & ASSOCIATES, LTD., and Harvey L. Walner, Defendants.**

**No. 93 C 5176.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 23, 1994.

---

Ronald S. Fishman, Fishman & Fishman, Ltd., Mark D. DeBofsky, DeBofsky & De-Bofsky, Chicago, IL, for plaintiff.

Laurie E. Leader, Leader & Hunt, P.C., Northbrook, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Carole Janopoulos sues Harvey L. Walner and his law firm, Harvey L. Walner & Associates, Ltd. (collectively "Walner") for sexual harassment, retaliatory discharge and intentional infliction of mental distress. On the first day of trial, the court granted Walner's

motion for a mistrial and assessed jury costs against Janopoulos. *See* Order, No. 93 C 5176 (N.D.Ill. June 10, 1994). Janopoulos moves for reconsideration of the mistrial order, renews her motion to bar James Hayes' expert testimony, and moves to amend the final pretrial order. Walner moves to dismiss the action and seeks sanctions.

## BACKGROUND

On March 31, 1994, the court granted Walner's motion *in limine* to bar introduction of evidence regarding two prior Equal Employment Opportunity Commission ("EEOC") complaints filed against him by two other former employees. *See* Memorandum Opinion and Order, No. 93 C 5176 (N.D.Ill. Mar. 31, 1994) at 7–8. On April 5, 1994, the court denied Janopoulos' motion to reconsider the ruling barring the evidence. *See* Memorandum Opinion and Order, No. 93 C 5176 (N.D.Ill. Apr. 5, 1994) at 2–3. In both decisions, the court clearly ruled that evidence of other sexual harassment allegations against Walner is inadmissible character evidence under Fed.R.Evid. 404(a).

Trial commenced on June 10, 1994, and the court granted Walner's motion for a mistrial that same afternoon. *See* Order, No. 93 C 5176 (N.D.Ill. June 10, 1994). In addition to ordering a mistrial, the court ordered Janopoulos to pay jury costs. *Id.; see also* Transcript of Proceedings Before the Honorable Suzanne B. Conlon and a Jury, No. 93 C 5176 (N.D.Ill. June 10, 1994) (Tr.) at 108.

At trial, Janopoulos called three witnesses, all former Walner employees, and testified herself. Janopoulos called Lorraine Pala (Tr. 31–43); Colleen Patricia Deutsch (Tr. 43–50); and Diane Soto (Tr. 51–56). Pala and Soto filed EEOC complaints against Walner prior to Janopoulos' complaint. Pursuant to the court's *in limine* rulings, testimony concerning these witnesses' sexual harassment claims was barred. *See* Memorandum Opinion and Order, No. 93 C 5176 (N.D.Ill. Mar. 31, 1994) at 7–8.

Janopoulos' attorney Ronald Fishman conducted direct examinations of Pala and Soto; Janopoulos' other attorney, Mark DeBofsky, conducted direct examination of Deutsch. After sustaining several objections to Pala's testimony, the court ordered a sidebar conference. Tr. 35. Outside the jury's presence, the court admonished Janopoulos' counsel not to introduce evidence barred by the court's *in limine* rulings. Tr. 36. In addition, the court inquired about the purpose for calling Pala as a witness. *Id.* Janopoulos' attorneys articulated three bases for the testimony.

First, Janopoulos' counsel argued that the testimony would establish that Walner often closed his office door, and that no one could see what went on inside his office. For instance, Soto testified that Walner's office door is made of wood, so people outside his office cannot see inside when the door is closed. Tr. 54–55. In addition, Pala was asked whether Walner would shut his office door when she was inside, whether Walner would lock his office door, and whether she was ever alone in Walner's office when no one outside the office could see what was going on inside. Tr. 35, 40–41. The court sustained Walner's objections to these questions as leading, irrelevant, and suggestive. *Id.*

Second, Janopoulos' attorneys argued that the testimony would concern instances in which the witnesses heard Walner treating Janopoulos in a sexually abusive manner. Tr. 36–37. The court did not find this line of testimony objectionable under Fed.R.Evid. 404(a). However, when Janopoulos' counsel were repeatedly unable to lay a foundation for their inquiries, the court sustained numerous objections. For instance, Deutsch could not recall any specific conversation between Walner and Janopoulos. Tr. 45–50. In addition, Soto stated that she never saw Walner angry with Janopoulos. Tr. 54. Pala could only recall one instance when Janopoulos was not present and Walner was looking for her because he needed something done; Pala testified that she heard Walner refer to the absent Janopoulos as "a bitch," and complain that Janopoulos was never around. Tr. 39, 41–42.

Finally, counsel sought testimony from Pala and Soto about Walner's behavior toward them. Tr. 36. The court repeatedly admonished Janopoulos' attorneys to respect

its *in limine* rulings. Tr. 30, 35, 36, 57, 58.[1] In both its March 31 and April 5, 1994 decisions, the court explicitly ruled that evidence of prior sexual harassment allegations against Walner must be excluded as anticharacter evidence under Fed.R.Evid. 404(a). Despite the evidentiary rulings and the court's repeated admonitions during trial, Janopoulos' attorneys persisted in asking questions designed to elicit prohibited testimony: What would happen when Pala was sitting in Walner's office (Tr. 35); whether Walner ever screamed at Pala (Tr. 40); and whether Walner locked the door to his office when only he and Pala were inside (Tr. 40–41). These questions had no legitimate purpose; they were intentionally posed in order to misdirect the jury's attention from the issues in this case and to unfairly prejudice Walner by suggesting that he has a character trait for sexually harassing female employees.

The "final straw" that precipitated mistrial occurred during Janopoulos' own testimony. Janopoulos was asked *when* she filed her EEOC complaint; that is, how long had it taken her to file the complaint after first considering the notion.[2] Janopoulos began her answer as follows: "Well, when Lorraine Pala filed her complaint—." Tr. 108. Janopoulos' answer was interrupted by an objection, and the court granted Walner's motion for a mistrial at the ensuing sidebar conference. *Id.* Janopoulos now moves for reconsideration of the mistrial order; Walner moves to dismiss the action and seeks sanctions in light of the conduct causing the mistrial.

## DISCUSSION

### 1. Reconsideration

Janopoulos and her attorneys repeatedly ignored evidentiary rulings and deliberately elicited inflammatory, irrelevant testimony despite warnings by the court. Nevertheless, Janopoulos moves for reconsideration of the order granting Walner's mistrial motion and assessing jury costs against Janopoulos. Janopoulos' motion is yet another attempt to relitigate the court's two decisions barring evidence that two other former employees filed EEOC complaints against Walner for sexual harassment. Accordingly, Janopoulos' motion is duplicative, improper, and untimely.[3]

In addition, the arguments presented in Janopoulos' present motion are meritless. Janopoulos argues that testimony about the prior EEOC complaints provides necessary background for the witnesses' testimony and is inextricably connected to testimony about Walner's treatment of Janopoulos. Alternatively, Janopoulos asserts that the testimony establishes that she was subjected to a hostile work environment.

### a. Testimony as "background"

■ Janopoulos argues that testimony about prior EEOC complaints and Walner's behavior toward other female employees provides necessary background for the wit-

---

1. The following colloquy demonstrates that Janopoulos' attorneys intentionally ignored the court's evidentiary rulings:

   THE COURT: What is your purpose for calling this witness [Lorraine Pala]?

   MR. FISHMAN: Well, to show the fact that Mr. Walner locks his door ... and also, we would like the time to have this woman also testify at this point as to what happened to her. Now admittedly, the motion *in limine* bars—

   THE COURT: You may remove the witness from the stand because she is not testifying to that. I think it is improper for you to put her on the stand, under the circumstances.

   Tr. 36. Clearly, testimony "as to what happened to her" was expressly barred under the court's *in limine* rulings and had no legitimate purpose.

2. In her declaration in opposition to Walner's motion to dismiss, Janopoulos inaccurately at-

   tests that she was asked "what caused [her] to file an EEOC complaint." *See* Pl. Opposition, Janopoulos Declaration, ¶ 3. In fact, the exact question she was asked was: *When* did you start thinking about it? In other words, *"how long* did it take you from the time you first started thinking about filing an EEOC complaint to the actual time you went down there to file it?" Tr. 108. Accordingly, Janopoulos' contention that: "my language may not have been exact, but I had no intention of violating the court's order" lacks credibility. *Id.*

3. Janopoulos previously moved for reconsideration of the ruling barring testimony of other EEOC complaints; her motion was denied on April 5, 1994. *See* Memorandum Opinion and Order, No. 93 C 5176 (N.D.Ill. Apr. 5, 1994).

nesses' testimony about Walner's behavior toward Janopoulos. At trial, Janopoulos' attorneys proffered that Pala and Soto complained about Walner to Janopoulos, who then would advise Walner of the complaints. Tr. 31, 59. The court noted that testimony concerning what Pala and Soto told Janopoulos would be hearsay. Tr. 31. Thus, the court ruled that the witnesses would only be permitted to testify about specific interactions between Janopoulos and Walner—and reminded Janopoulos' counsel that a proper foundation must be laid for such testimony. Tr. 59.

In response, Janopoulos' attorneys maintained that it would be difficult for the witnesses to separate what happened to them from what happened to Janopoulos. Tr. 57–58. Counsel elaborated:

> Once they get into that, their own personal experience comes out. In other words, one of the problems over here is when they had problems, they went to Ms. Janopoulos. Ms. Janopoulos would then go to Mr. Walner. So that the result is, the result which you have is a linking of the two. You have a complaint to Ms. Janopoulos then berating by Mr. Walner. The problem we're having over here is I told these witnesses [sic] before she walked on, she can't mention anything about herself because of the Court's ruling. The moment you exclude comments about what she went through, you virtually take out of her testimony anything that is relevant because these women are afraid to testify as to what really occurred.

Tr. 59. Janopoulos presents the same argument on reconsideration.

Janopoulos' argument fails for a number of reasons. First, Janopoulos did not advance this position in either her opposition to the motion *in limine* or in her motion for reconsideration of the court's ruling. Moreover, Janopoulos fails to show that the witnesses' purported confusion about what happened to them (as opposed to what happened to Janopoulos) warrants circumventing Fed.R.Evid. 404(a).[4] Finally, the assertion that the witnesses cannot distinguish between Walner's treatment of them and his treatment of Janopoulos is not logical or credible. Thus, Janopoulos fails to establish that the witnesses' dealings with Walner are necessary background to their testimony about Walner's treatment of Janopoulos.

#### b. Hostile work environment

▇▇▇ Alternatively, Janopoulos seeks to introduce the disputed testimony for the purpose of establishing a hostile work environment.[5] At trial, Janopoulos' attorneys argued that: "[t]hese women [*i.e.*, Pala and Soto] can testify to an environment that Ms. Janopoulos was working under." Tr. 57. The court noted that testimony about Janopoulos' work environment would generally be admissible, but counsel had failed to lay a proper foundation for the testimony. *Id.* In other words, Janopoulos failed to establish that testimony about Walner's alleged harassment of Pala, Soto, or other female employees would implicate Janopoulos' work environment.

▇▇▇ In order to constitute sexual harassment, a plaintiff's work environment must unreasonably interfere with her work performance or be intimidating, hostile or offensive. *See Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526, 533 (7th Cir.1993). The Supreme Court has clearly held that not all inappropriate behav-

---

**4.** Assuming a proper foundation can be laid, the witnesses may testify about what they heard or saw occur between Janopoulos and Walner. If their own alleged harassment by Walner was the trigger for their memories of Walner's harassment of Janopoulos, then counsel could have sought leave to ask leading questions to avoid violating the *in limine* rulings. However, Janopoulos' counsel never sought leave to do so at trial.

**5.** Janopoulos does not contend that she was subjected to *quid pro quo* sexual harassment. Rather, Janopoulos' complaint alleges that Walner "created a sexually hostile work environment"; there is no mention of *quid pro quo* sexual harassment. *See* Complaint, ¶ 6. *Quid pro quo* harassment occurs where a supervisor demands sexual favors in exchange for promises of raises, promotions, improved work, or other career or economic advancement. *See, e.g., Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526, 531 (7th Cir.1993).

ior is tantamount to a hostile work environment. As the Court has explained:

> For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Similarly, in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed that: "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." However, the *Harris* Court held that a plaintiff need not prove psychological injury to prevail on a sexual harassment claim: "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. Thus, the standard for hostile work environment sexual harassment is "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.*[6]

Janopoulos belatedly cites a number of decisions in contending that testimony about Walner's behavior toward other female employees should be admitted to establish that her work environment was hostile. These cases are inapposite. In *EEOC v. Gurnee Inn Corp.,* 48 FEP Cas. 871, 1988 WL 129327 (N.D.Ill.1988), *aff'd on other grounds,* 914 F.2d 815 (7th Cir.1990), the EEOC sued an employer for sexual harassment by one of its managers. Eleven former Gurnee Inn employees were allowed to testify at trial. *Gurnee Inn,* 914 F.2d at 816. Similarly, in *Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010 (8th Cir.1988), three plaintiffs sued their employer for failing to protect them from sexual harassment by their coworkers. All three plaintiffs were permitted to testify. *See Hall,* 842 F.2d at 1012 (describing testimony).

■ This case is distinguishable from *Gurnee Inn* and *Hall.* Unlike the plaintiffs in *Gurnee Inn* and *Hall,* Janopoulos does not allege that a manager sexually harassed her and that the employer was aware of the harassment but failed to intervene. Janopoulos' suit is not a *respondeat superior* claim of sexual harassment against an employer for the actions of one of its agents. Rather, Janopoulos sues Harvey Walner as the *alter ego* of his firm and alleges that Walner himself harassed her. *See Janopoulos v. Harvey L. Walner & Associates, Ltd.,* 835 F.Supp. 459, 463–63 (N.D.Ill.1993). Thus, there is no issue here whether an employer was aware that one of its employees was engaging in ongoing harassment yet failed to intervene. Accordingly, Janopoulos fails to demonstrate how testimony about other women Walner allegedly harassed would be relevant to her claims.[7]

### c. Conclusion

■ For all of these reasons, Janopoulos' present motion lacks merit: The mistrial and jury costs order must stand. Janopoulos' attorneys were admonished to respect the court's prior evidentiary rulings and were

---

6. Whether a plaintiff's work environment is hostile or abusive requires an evaluation of the totality of the circumstances. Relevant factors include:

   > the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [and the] effect on the employee's psychological well-being....

   *See Harris,* —— U.S. at ——, 114 S.Ct. at 371.

7. Janopoulos also cites *Jones v. Flagship Int'l,* 793 F.2d 714 (5th Cir.1986), for the proposition that evidence of Walner's alleged sexual harassment of Pala and Soto is admissible due to its affect on Janopoulos' own psychological health. *See* Motion at 6. Walner argues that the Supreme Court's recent holding in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)—that sexual harassment does not require psychological injury to the plaintiff—means that Janopoulos' reliance on *Jones* is misplaced. However, psychological injury to the plaintiff remains one factor that may be considered in assessing a sexual harassment claim. *Harris,* —— U.S. at ——, 114 S.Ct. at 371.

expressly warned that if a mistrial were ordered, jury costs would be assessed. Tr. 36. Nevertheless, counsel repeatedly and intentionally sought to elicit testimony in violation of the court's rulings. *Id.* When Janopoulos referred to Pala's EEOC complaint in her direct examination, her conduct was consistent with her attorneys' pattern of deliberately violating the *in limine* rulings.[8]

Janopoulos attests that her testimony was not improper because she decided to file an EEOC complaint after she learned that Walner had harassed other employees. *See* Pl. Opposition, Janopoulos Declaration, ¶ 1. Janopoulos belatedly maintains that her testimony regarding Pala's complaint should not have caused a mistrial because when she told Walner that she would testify against him before the EEOC (on Pala's behalf), he made threats of physical violence against her. *Id.* Janopoulos had two opportunities to proffer the argument regarding Walner's purported threats against her—in opposition to the motion *in limine* and on reconsideration—yet failed to proffer this testimony for that purpose. In addition, Janopoulos' current proffer does not appear to be relevant to her claim that Walner sexually harassed her.

Janopoulos' testimony was immediately interrupted by objection; the court asked her attorneys whether she had been advised of the rulings *in limine*. Tr. 108. Her counsel stated that Janopoulos had been apprised of the *in limine* rulings, but she had simply lost her composure on the witness stand. *Id.* This explanation lacks credibility. The court observed Janopoulos' demeanor during her testimony and immediately thereafter. Janopoulos did not appear to be flustered while on the stand. On the contrary, she was composed and her testimony was clear and thoughtful. Janopoulos' contention that she

was "extremely distraught [and] very upset that a mistrial had been declared" is irrelevant. *See* Pl. Opposition, Janopoulos Declaration, ¶ 4. Even if Janopoulos was upset after the mistrial, she clearly acted deliberately while on the witness stand. Accordingly, the court finds that Janopoulos—with the assistance of counsel—intentionally ignored the court's prior evidentiary rulings, and thereby caused a mistrial.

The court granted Walner's mistrial motion and ordered Janopoulos to pay jury costs because her and her counsel's repeated and willful violations of the court's *in limine* orders jeopardized Walner's right to a fair trial. Janopoulos' and her counsel's pattern of conduct created the likelihood of unfair prejudice, jury confusion, and waste of time over collateral issues regarding unadjudicated claims of other former Walner employees. In addition, this conduct resulted in a waste of scarce civil jury resources. Accordingly, Janopoulos' motion for reconsideration of the order granting Walner's mistrial motion and assessing jury costs is denied.

**2. Dismissal/Sanctions**

In light of the order granting a mistrial and assessing jury costs against Janopoulos, Walner moves to dismiss the action and also seeks sanctions. Walner notes that Janopoulos and her attorneys deliberately ignored the court's evidentiary rulings despite repeated warnings at trial. Walner argues that Janopoulos' conduct amounted to "contumacious disregard for this court's orders." Motion to Dismiss at 4. Walner concludes that "it is apparent that the Plaintiff was attempting to create a mistrial rather than to avoid one." *Id.* at 14. Walner argues that Janopoulos and her attorneys must be sanctioned for their misconduct.[9]

---

**8.** Janopoulos attests that she "never stated that Lorraine Pala filed a complaint with the EEOC." Pl. Opposition, Janopoulos Declaration, ¶ 3. In fact, Janopoulos testified that she started thinking about filing her EEOC complaint "when Lorraine Pala filed her complaint." Tr. 108.

**9.** Walner asserts that Janopoulos and her attorneys were unrepentant immediately after the mistrial was ordered. According to Walner, Janopoulos asserted in court shortly after the trial ended: "I don't care what the judge says, it's the

truth and the truth is going to come out." *See* Def. Ex. F, ¶ 3. In addition, Walner claims that Janopoulos' counsel boasted that: "this [*i.e.*, a mistrial] is going to happen three or four more times before this case ever gets to a jury." *Id.*, ¶ 4. Although he denies making a threat to provoke another mistrial, one of Janopoulos' attorneys admits that immediately after the aborted first trial, he told Walner's counsel that he thought "there was a possibility of future mistrials." Pl. Opposition, DeBofsky Declaration, ¶ 4.

The court may dismiss an action "for failure ... to comply with [the Federal Rules of Civil Procedure] *or any order of the court.*" Fed.R.Civ.P. 41(b). In addition, Janopoulos' counsel may be required to pay Walner's attorneys' fees and costs if the court finds that her counsel "multiplie[d] the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927. Moreover, the court possesses inherent power to require Janopoulos to pay Walner's attorneys' fees for "willful disobedience of a court order," or upon a finding of oppressive or vexatious conduct or bad faith. *See, e.g., Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622–23, 44 L.Ed.2d 141 (1975).

Although the court has authority to dismiss the action and to assess attorneys' fees, it declines to impose these extreme sanctions at this juncture. The court has already found that Janopoulos and her attorneys intentionally and repeatedly disregarded the court's *in limine* rulings. Accordingly, the court ordered a mistrial and assessed jury costs. Although it is clear that Janopoulos' conduct was deliberate, it is less obvious that her counsel actually sought a mistrial. More likely, counsel believed that through tenacity they could introduce inflammatory testimony by indirect means and innuendo. Although the conduct of Janopoulos and her attorneys is inexcusable, it would not serve the interests of justice to dismiss this action or to impose additional sanctions unless this conduct is repeated.[10] The mistrial and jury costs sufficiently penalize Janopoulos and her attorneys.

Although Walner's motion is denied, Janopoulos and her attorneys are on notice that further misconduct may result in dismissal of her case and sanctions. In the future, should Janopoulos or her attorneys deliberately attempt to circumvent the court's evidentiary rulings by introducing testimony that unfairly prejudices Walner and misdirects the jury's attention to irrelevant, inflammatory matters, another mistrial shall ensue. Accordingly, dismissal and imposition of sanc-tions may be warranted by future misconduct.

### 3. Pretrial Order

Janopoulos moves to amend the final pretrial order to add Walner as an adverse witness. Janopoulos wants "to impeach" Walner pursuant to Fed.R.Evid. 607. The parties filed their final pretrial order on March 16, 1994. *See* Order, No. 93 C 5176 (N.D.Ill. Mar. 16, 1994). Pursuant to Fed. R.Civ.P. 16(e) and Local Rule 5.00, final pretrial orders may be modified only to prevent manifest injustice. Indeed, the joint pretrial order submitted by the parties in this case was captioned *final* pretrial order. Janopoulos fails to meet the heavy burden for amending the pretrial order.

Janopoulos advances no reasons why amending the final pretrial order would prevent manifest injustice. In fact, Janopoulos' own explanation belies a finding of manifest injustice: Janopoulos states that Walner is already a defense witness; she asserts that "[s]ince Walner has already been named as a witness in the final pretrial order, and because no new trial date has been set, the proposed amendment should not surprise or prejudice the defendants." Motion to Amend at 1. Because Walner is already a defense witness, Janopoulos will have an opportunity to cross-examine him on the witness stand. In addition, lack of prejudice to Walner is not sufficient grounds for amending the final pretrial order. Janopoulos will have ample opportunity to impeach Walner during cross-examination. Janopoulos' motion is denied.

### 4. Expert Testimony

James Hayes is a documents expert whom Walner identified as an expert witness on March 16, 1994. The court denied Janopoulos' motion *in limine* to bar Hayes' testimony on April 6, 1994. *See* Memorandum Opinion and Order, No. 93 C 5176 (N.D.Ill. Apr. 6, 1994) (vacating March 31, 1994 decision barring expert testimony by Hayes and Dr. Alexander Oblonsky). Hayes was deposed on May 25, 1994. Janopoulos renews her

---

10. At trial, the court warned Janopoulos' counsel that if they were to cause a mistrial, they would be required to pay jury costs. Tr. 36. However, the court did not warn counsel that continued violations of the *in limine* rulings would result in involuntary dismissal or sanctions.

motion to bar Hayes' testimony based on information disclosed at his deposition.

Janopoulos advances three reasons for barring Hayes' testimony: (1) Hayes' opinions are based substantially on hearsay; (2) Hayes' opinions expressed at his deposition contradict opinions given in his sworn declaration dated March 24, 1994; and (3) Hayes' opinions fail to meet the standards for expert testimony articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The gravamen of Janopoulos' motion is that Hayes' testimony is improper because his conclusions are based in part on ink analyses performed by Robert Kuranz. Hayes examined disputed records by visual inspection, by performing visual spectral comparisons, and by using electrostatic detection apparatus. *See* Hayes Dep. at 28–35. Hayes then engaged Kuranz to perform two additional tests: ink analysis using thin layer chromatography ("TLC") and a comparison of relative aging characteristics. Kuranz' TLC ink analysis showed that the ink used to make Dr. Cochran's initial entry dated August 17, 1992 was not commercially available until 1993. Kuranz' comparison of the relative aging characteristics of Dr. Cochran's medical records revealed that entries dated August 17, 1992 and December 22, 1993— entries allegedly made almost 18 months apart—had similar drying characteristics. Kuranz found that entries dated May 24, 1993 and February 22, 1994 also had similar drying characteristics.

■■■■■ Janopoulos' first argument for barring Hayes' testimony is without merit. Experts are allowed to rely on hearsay in forming their opinions, as long as their opinions are based on the type of evidence reasonably relied on by experts in that particular field. *See, e.g., AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035, 1045 (7th Cir.1990). Fed.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Thus, Rule 703 specifically allows experts to rely on information that would not be admissible, including hearsay. *See generally* Jack B. Weinstein & Margaret A. Berger, 3 *Weinstein's Evidence* § 703[03] at 703–18 (1993 & Supp.1994) ("Expert testimony based on inadmissible evidence, including hearsay, is now the rule rather than the exception").

■■■■ Specifically, an expert may rely in part on information supplied by another expert. The case Janopoulos relies on does not state otherwise. In *Matter of James Wilson Assoc.,* 965 F.2d 160 (7th Cir.1992), the Seventh Circuit reaffirmed that:

An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented. Fed.R.Evid. 703. And in explaining his opinion an expert witness normally is allowed to explain the facts underlying it, even if they would not be independently admissible.

*Id.* at 172–73; *accord United States v. Smith,* 964 F.2d 1221, 1222–23 (D.C.Cir.1992).

The Seventh Circuit held in *James Wilson* that although the expert could explain the basis for his opinion, including facts that would be inadmissible, "[t]he fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion." *Id.* at 173. The crux of the *James Wilson* decision is that an expert may not be used "as a vehicle for circumventing the rules of evidence" to introduce inadmissible evidence for its own sake. *Id.*

Thus, whether Hayes' testimony is admissible hinges on whether Hayes' opinions are based on facts or data reasonably relied upon by experts in his particular field in forming opinions or inferences. *See* Fed.R.Evid. 703. Sufficient evidence has been proffered to establish that Kuranz' test results are reasonably relied upon by document experts. The

tests themselves are widely used in the field and have been accepted by numerous state and federal courts; Kuranz, the chief ink chemist for Parker Pen, is a well-respected authority on ink analysis. *See* Hayes' Dep. 38–39, 52–53, 78–79, 84.

TLC ink analysis is widely and successfully used to determine the formula and release date of an ink sample.[11] The ink chemist compares the tracers and tags in the sample ink with known information provided by the ink manufacturers, known as reference files, to determine the date the ink was released. *See* Hayes' Dep. 51, 58–60. The ink analysis can only be performed by one of the three private ink chemists with access to the necessary reference files; Hayes is not one of these three people but Kuranz is. *Id.* at 39–40.

Relative age solvent extraction comparison is also a reputable method of dating ballpoint inks.[12] The longer ink is on paper, the drier it becomes and the slower it extracts into solvents. Hayes Resp., Ex. D, Richard L. Brunelle, "Ink Dating: The State of the Art in 1990," at 7. Thus, it is possible to determine the relative age (*i.e.*, earlier, contemporaneous or later) of a questioned ink by comparing its extraction rate with a known dated ink having the same formulation. *Id.*

Janopoulos submits no evidence suggesting that Kuranz or the tests he performed are unreliable. Janopoulos simply objects to Hayes basing his expert testimony on tests Kuranz performed. However, Hayes' opinions are not simply based on Kuranz' tests. Hayes performed his own tests on Dr. Cochran's medical records, and his conclusions are based on both his own findings and those supplied by Kuranz. The fact that Hayes did not personally perform all the tests upon which he bases his opinions does not invalidate his testimony.

Janopoulos' second argument for barring Hayes' testimony is also without merit. Hayes' March 24, 1994 declaration does not mention that some tests were performed by Kuranz. Instead, Hayes appears to imply that he performed the TLC ink analysis and the relative aging characteristics tests himself. Hayes Mot., Ex. A, Hayes' March 24, 1994 Decl., ¶¶ 5–6. At his deposition, Hayes clarified the tests that he performed and those that Kuranz performed for him. Janopoulos argues that Hayes' failure to disclose in his declaration detailed information furnished in his later deposition testimony means that Hayes' trial testimony should be barred. However, discrepancies in Hayes' testimony and declaration go to the weight rather than the admissibility of his opinions. Janopoulos will have an ample opportunity to question Hayes about the bases for his opinions on cross examination. *See Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1401–02 (N.D.Ill. 1993).

Finally, Hayes' opinions appear to meet the standards for expert testimony articulated by Supreme Court the in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court stated in *Daubert* that trial courts considering a proffer of expert testimony must determine, pursuant to Fed. R.Evid. 104(a),

> whether the expert is proposing to testify (1) to scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.,* —— U.S. at ——, 113 S.Ct. at 2796. The Court noted that one of the factors to be

---

11. *See* Hayes Resp., Ex. D, Richard L. Brunelle, "Ink Dating: The State of the Art in 1990," at 2; Hayes Resp., Ex. E, I.R. Tebbett, "Chromatographic Analysis of Inks for Forensic Science Applications," 3 *Forensic Sci.Rev.* 71 (1991); Hayes Resp., Ex. F, R. Brunelle & R. Reed, "Forensic Examination of Inks" (chapter 8) in *Forensic Examination of Ink & Paper* (1984).

12. *See* Hayes Resp., Ex. D, Richard L. Brunelle, "Ink Dating: The State of the Art in 1990," at 7; Hayes Resp., Ex. F, R. Brunelle & R. Reed, "The Dating of Inks" (chapter 9) in *Forensic Examination of Ink & Paper* (1984).

considered is "the known or potential rate of error." *Id.*, —— U.S. at ——, 113 S.Ct. at 2797. Janopoulos contends that Hayes' testimony fails the Rule 104(a) test outlined in *Daubert* because Hayes does not know the potential error rate of Kuranz' ink analysis or the specific nature of Kuranz' calculations.

Janopoulos' Rule 104 argument is unpersuasive. The TLC ink analysis test and the relative age solvent extraction comparison test are generally accepted tests for determining the validity of documents. *See Daubert*, —— U.S. at ——, 113 S.Ct. at 2797. Rates of error, or confidence rates, are only one factor to consider in determining the admissibility of an expert's testimony. *Id.* This court is sufficiently satisfied with the propriety of Kuranz' tests to allow Hayes to discuss them. Janopoulos may challenge Hayes' opinions and impeach his credibility on cross-examination.

Finally, Janopoulos contends that Hayes' testimony must be excluded because "the dangers of potential prejudice and confusion inherent in allowing Hayes to give opinions based on Kuranz' work implicate the exclusionary principles of FRE 403." Hayes Mot. at 7. Janopoulos' argument that Hayes' testimony must be barred under Rule 403 because the jury will be confused when Hayes testifies about tests performed by someone else is frivolous. Hayes may explain the bases for his opinions in response to succinct and logical questions; no risk of jury confusion has been shown.

### CONCLUSION

Plaintiff Carole Janopoulos' motions for reconsideration of the court's June 10, 1994 order; to amend the final pretrial order; and to bar James Hayes' testimony are denied. Defendants Harvey L. Walner and Harvey L. Walner & Associates' motion to dismiss and for sanctions is denied.